OPINION OF THE COURT
Vito M. DeStefano, J.
Defendant Glen Cove City Central School District moves for an order pursuant to CPLR 3212 granting it summary judgment dismissing the cross claim, and complaint, insofar as asserted against it.
Background
On March 27, 2013, defendant Glen Cove City Central School District entered into an agreement with defendant J. Anthony Enterprises Inc. whereby J. Anthony agreed to serve as the *341 general contractor in connection with the renovation of the boys and girls locker rooms at the Glen Cove High School (the project). Pursuant to that agreement (the general contract), J. Anthony agreed to:
“Remove and dispose of the following asbestos containing, and/or asbestos contaminated materials, in the following areas:
“3. Abatement contractor to remove and dispose of all asbestos containing pipe fitting and pipe insulation located above the existing ceiling throughout the boys and girls locker rooms and team locker rooms. The contractor is advised that this material is in very close proximity to the existing ceiling and in the boys shower drying room has delaminated and is lying on the ceiling. The abatement contractor to perform all work in accordance with all applicable federal, state and local regulations” (exhibit A to motion at GC000230).
On March 6, 2013, J. Anthony entered into a subcontract agreement with plaintiff 212 Services, LLC whereby 212 Services agreed to supply labor, material, equipment and containers to complete asbestos abatement work at the project in exchange for $127,500 (subcontract). The subcontract documents consisted of:
“(1) this Agreement; (2) the [General] Contract, consisting of the Agreement between the [District] and [J. Anthony] and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the [District] and [J. Anthony], whether before or after the execution of this Agreement; (4) other documents listed in Article 16 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or .repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16” (exhibit H to motion at art 1).
*342 With respect to the scope of work to be performed, the subcontract set forth the following:
“The Subcontractor shall execute the following portion of the Work described in the Subcontract Documents, including ....
“4. Provide all labor and materials required to perform all asbestos abatement as indicated on the contract documents ....
“9. Coordinate all asbestos removal activities through the District’s environmental consultant— J.C. Broderick.
“10. All asbestos and demolition work to be phased as per the contract documents ....
“Work to be: ceiling plaster (ACM) [asbestos containing materials] in girls and boys locker rooms approx. 7,000 S/F plus all insulation, fittings, etc that are indicated on drawings and specifications” (exhibit H to motion at art 8).
On October 26, 2012, following an inspection and bulk sampling, nonparty J.C. Broderick & Associates, Inc. (JCB) prepared an “Asbestos Pre-Construction Survey, Bulk Sampling & Analysis of Additional Suspect Asbestos Containing Materials” (JCB analysis). The JCB analysis, which was based on bulk sampling conducted by JCB and on a prior sampling done by nonparty Enviroscience, indicated that some of the materials used at the project contained asbestos while others did not. Specifically, the bulk sampling indicated that there was no asbestos in the “pipe insulations,” “pipe fitting insulation,” “pipe insulation, wrap paper with tar paper cover,” or “tar paper cover on pipe insulation” (exhibit B to Oladiran aff in opposition at 1-2). Notwithstanding the bulk sampling and the results set forth in the JCB analysis, JCB included in its analysis the following provision:
“Limitations:
“Although JCB took great care to identify and sample all suspect asbestos containing materials in the areas identified as being impacted by the proposed scope of work several areas (spaces) and or suspect building materials may have not been accessible for inspection and or sampling without significant damage to the existing building” (exhibit B to Oladiran aff in opposition at 3).
As part of the JCB analysis, JCB recommended that the “district architect consider including an allowance for asbestos abatement work. The allowance shall be used to cover the cost *343 of asbestos abatement work resulting in unforseen conditions discovered during demolition and beyond the scope of the contract documents” (exhibit B to Oladiran aff in opposition at 3).
On May 25, 2013, 212 Services commenced asbestos removal work at the project. “Upon fully opening the ceiling it became apparent that much more of the piping was wrapped in ACM than was indicated on the drawings and specifications” and that 212 Services “agreed to expand the scope of work on the Project to include the additional ACM wrapping the piping in exchange for additional compensation” (Oladiran aff in opposition ¶¶ 14-18; exhibit C to Oladiran aff in opposition). According to the affidavit of Adesanola Oladiran, the head of operations of 212 Services, prior to entering into the subcontract, 212 Services conducted “a limited inspection in the areas above the locker rooms ceilings”; that it
“was impossible to know from the inspection that there was ACM wrapping the pipes above the locker rooms due to the extremely limited nature of the inspection and the simple fact that [212 Services] was not the party that conducted the asbestos investigation, that drafted the asbestos survey or that drafted the plans upon which the scope of work is based”; but that on May 25, 2013, upon “fully opening the ceiling it became apparent that much more of the piping was wrapped in ACM than was indicated on the drawings and specifications.”[1]
Oladiran further stated that, pursuant to the terms of the subcontract, and upon “receiving a signed change order for the additional ACM wrapping,” 212 Services “agreed to expand the scope of work on the Project to include the additional ACM wrapping the piping in exchange for additional compensation” (Oladiran aff in opposition ¶¶ 14-18; exhibit C to Oladiran aff in opposition).[2]
Excerpts from one of the biweekly construction progress meetings held on June 14, 2013 indicate that “J. Anthony questioned note in JC Broderick scope of 'all pipe insulation above ceiling to be removed’ ”; and that the architect “stated *344 any insulation in addition to what’s shown on drawing will be accounted for and taken out of allowance. Quantities to be determined” (exhibit B to J. Anthony affirmation in opposition). This “item number” was revisited during subsequent progress meetings in which it was indicated that J. Anthony had “brought concerns to architect and CM.”
On June 27, 2013, 212 Services submitted various invoices to J. Anthony seeking additional compensation for certain work it performed (removal and disposal of asbestos containing pipe fitting and pipe insulation) which was allegedly beyond the scope of the subcontract (exhibit I to motion). Some of those invoices were rejected by J. Anthony inasmuch as the additional work contained therein was part of the base subcontract (exhibit I to motion). Numerous emails followed between 212 Services and J. Anthony with respect to payments purportedly owed to 212 Services for the additional asbestos abatement it conducted at the project (exhibits J, K to motion). The emails indicated that J. Anthony issued change orders for certain approved changes but not others. Specifically, some of the additional work conducted by 212 Services for which it sought additional compensation (as being beyond the scope of the subcontract) was rejected by J. Anthony on the ground that the “additional work” was not additional but, rather, was part of the base subcontract for which additional compensation was not warranted (exhibit K to motion).
On July 26, 2013, the District approved an “Abatement Allowance” in the amount of $15,000. Of that amount, $14,320 was deducted for the “abatement of additional pipe insulation encountered within walls required for installation of new work” (exhibit D to motion).* *[3]
By letter dated January 16, 2014, 212 Services “served” a “Notice of Lien for Public Improvement” with respect to the project upon both the Treasurer and Superintendent of Schools *345 for the District (exhibit A to 212 Services affirmation in opposition).[4]
J. Anthony subsequently discharged the lien by filing a discharge bond dated January 28, 2014 (exhibit F to motion). Defendant International Fidelity Insurance Company was the surety.
On June 18, 2014, counsel for J. Anthony wrote to the District as follows:
“[J. Anthony] performed services in support of the construction it believes fall outside the scope of its contract with Glen Cove Central School District and submits the instant Notice of Dispute to challenge the District’s rejection of a proposed change order.
“[J. Anthony], through its subcontractor, 212 Services LLC, performed asbestos containing material remediation above the ceiling in girls and boys locker rooms. The concealed area contained significantly more asbestos containing material than anticipated. 212 Services requested an additional compensation from [J. Anthony] in the amount of $82,080. [J. Anthony] in turn conveyed 212 Services’ request for additional compensation to the District. The District denied the request. 212 Services completed its portion of the work on the project and renewed its demand for additional compensation.
“It is [J. Anthony’s] position that if it is required to compensate 212 Services for this work, then it is entitled to payment for this work from the District” (exhibit N to motion).
On June 19, 2014, International Fidelity advised 212 Services that, after having reviewed the proof of claim and supporting documentation, that there was “no amount currently due or payable” to 212 Services. Specifically, International Fidelity wrote:
*346 “The bulk of your client’s claim consists of purported change orders which were not signed and alleged by our Principal to be unauthorized. The approved change orders only total $15,115.00. Also, our Principal has alleged at least $15,000.00 in deduct change orders. As a result, the subcontract with uncontested change orders totals $127,615.00 of which $121,234.25 has been paid, leaving a possible retainage of $6,380.75. The retainage is also apparently contested at this time, at least in part due to the allegedly overstated lien filed by your client” (exhibit M to motion).
On May 1, 2015, counsel for 212 Services accepted service of the bond discharging the lien (212 Services affirmation in opposition ¶ 4).
Procedural History
On June 2, 2014, 212 Services commenced an action against J. Anthony, the District, Joseph Knesich (a principal of J. Anthony), and International Fidelity asserting causes of action for: breach of contract (against J. Anthony), account stated (against J. Anthony), class action diversion of lien law trust funds (against J. Anthony and Knesich), to foreclose a lien, and pursuant to State Finance Law § 137 (against International Fidelity) (exhibit O to motion). The District answered asserting general denials and various affirmative defenses and cross claims. Defendants J. Anthony, Knesich and International Fidelity interposed a separate answer also containing general denials, affirmative defenses, and a cross claim for indemnification against the District (exhibit Q to motion).
By order dated March 9, 2015 (DeStefano, J.), the court denied 212 Services’ motion for an order pursuant to CPLR 902 seeking class certification on behalf of all Lien Law article 3-A beneficiaries and also denied a cross motion for partial summary judgment dismissing 212 Services’ Lien Law claim.
In the instant motion, the District moves for an order granting it summary judgment dismissing the cross claim and the complaint, insofar as asserted against it.
For the reasons that follow, the motion is granted.
The Court’s Determination
Dismissal of Cause of Action to Foreclose a Mechanic’s Lien
The District initially argues that the fourth cause of action to foreclose the lien, to the extent asserted against it, must be *347 dismissed because the lien was discharged and, thus, “the District is no longer a necessary party to this action.”[5]
The law is well settled that “[u]pon the filing of such a discharge bond the public improvement lien previously filed attaches to the bond, which is substituted for the liened property” (Tri-City Elec. Co. v People, 63 NY2d 969, 971 [1984]). In this regard, Ruttura & Sons Const. Co., Inc. v Breco Envtl. Contrs. Inc. (2002 WL 34693747 [Sup Ct, Suffolk County, Jan. 28, 2002, index No. 16090/00]) is particularly instructive. In Ruttura, the plaintiff, a subcontractor hired for material and labor with respect to a public improvement contract entered into between codefendants, the Town of Smithtown, and general contractor, Breco Environmental Contractors Inc., commenced an action to foreclose on a mechanic’s lien. After the action was commenced, the mechanic’s lien was discharged upon the posting of a surety bond by Liberty Mutual Insurance Company.
The Town thereafter moved to dismiss the complaint against it and strike its name from the caption. The issue before the court was “whether the Town, as the property owner, remains a necessary party to this action when the lien has been bonded and discharged” (id. *1). In examining the purpose of the Lien Law, the Ruttura court stated:
“The Town argues that pursuant to New York Lien Law § 37 (7) a municipality must be dismissed from the foreclosure action upon the discharge of the lien. Specifically, that section states that the necessary parties to the foreclosure action include, ‘the principal and surety of the bond, the contractor and all claimants who have filed notices of claim prior to the date of filing of the summons and complaint.’
“In opposition, Ruttura [the subcontractor plaintiff] maintains that Lien Law § 44 should apply to the instant action. That section provides that in an action to enforce a lien against a public improvement, ‘all persons appearing by the records in the office of *348 the county clerk or register to be the owner of such real property’ are necessary parties defendant.
“The apparent conflict between § 37 (7) and § 44 of the Lien Law is best resolved after a close examination of the decision in Riverhead Transit Mix Corp. That court noted that ‘the owner must be joined under Section 44 where the action is one to enforce the lien, but need not be joined where the action is solely to recover upon the bond.’ Lien Law § 44 requires that the owner of a public improvement against which a lien is claimed be joined as a necessary party in an action to enforce a mechanic’s lien against such public improvement. Therefore, it follows that the Town would be a necessary party pursuant to § 44 if no bond had been posted to discharge the lien. See id. Upon the posting of such bond, however, the public improvement lien previously filed attaches to the bond, which is substituted for the liened property. Because the substitution of the bond for the mechanic’s lien discharges the lien, there no longer exists any claim against the liened property and the property owner is no longer a necessary party ....
“Moreover, this conclusion is bolstered by an examination of the purpose behind the Lien Law. Traditionally public property, whether it is owned by a municipality or a public benefit corporation, has been immune from execution and seizure to avoid an intolerable burden upon the public comfort and safety. The intent of the Lien Law is that a private lien shall attach to real property privately owned, whereas a public lien attaches solely to the funds of the public corporation due under the contract for the improvement. In the instant case, it is clear that the sole intention of plaintiff is to recover money that it is allegedly owed on the Contract; and, as its claim relates to funds due under a public improvement contract, its sole method of recovery from the Town is against the bond. Therefore, the Town is no longer a necessary party to this particular action. Accordingly, the Town’s motion to dismiss the complaint as against it pursuant to the plaintiff’s third cause of action is granted, the surety Liberty Mutual is substituted for the Town, and the Town’s name is struck from the caption.” (Ruttura & Sons Const. Co., Inc. v *349 Breco Envtl. Contrs. Inc., 2002 WL 34693747, *2-3 [citations omitted]; see also M. Gold & Son v A.J. Eckert, Inc., 246 AD2d 746, 747 [3d Dept 1998] [“Where the lien no longer attaches to real property-due to the filing of a bond under the Lien Law, it has been held that the owners of the real property are no longer necessary parties to the action”]; Melniker v Grae, 82 AD2d 798 [2d Dept 1981] [although mortgagee would be a necessary party to an action to enforce a lien against real property, once an undertaking is executed, there is no longer in existence an action against real property inasmuch as the bond replaces the real property as the security to be attached and, thus, the mortgagee’s interest in the real property would no longer require his joinder as a necessary party in the lien foreclosure action]; Bryant Equip. Corp. v A-1 Moore Contr. Corp., 51 AD2d 792 [2d Dept 1976] [where bond has replaced the real property as the security to be attached and attacked, there is no longer in existence an action to enforce a lien against real property, and, thus, complaint, insofar as asserted against subsequent mortgagee, was dismissed as mortgagee is not included among the class of parties to be served under Lien Law § 37]; but see Martirano Constr. Corp. v Briar Contr. Corp., 104 AD2d 1028 [2d Dept 1984] [court denied Girl Scouts’ motion to dismiss notwithstanding fact that general contractor filed bond discharging mechanic’s liens on property owned by the Girl Scouts]; compare Norden Elec. v Ideal Elec. Supply Corp., 154 AD2d 580, 581 [2d Dept 1989] [Norden Court found that, unlike the situation before it, the property owner in Martirano Constr. Corp. v Briar Contr. Corp. was named a party defendant “because it conceded that it was liable on the underlying debt, and because the lienor in that case sought recovery against the realty itself”].)[6]
In opposition, 212 Services argues that the bond discharging the lien was not served upon 212 Services until May 1, 2015, *350 after the commencement of the action and the serving of the instant motion.[7] However, pursuant to Lien Law § 21 (5), a
“lien against the amount due or to become due a contractor from the state or a public corporation for the construction or demolition of a public improvement may be discharged . . . [e]ither before or after the beginning of an action by a contractor or subcontractor executing a bond or undertaking in an amount equal to one hundred ten percent of such lien conditioned for the payment of any judgement which may be recovered in an action to enforce the lien.”
Dismissal of Cross Claim for Indemnification
Defendants J. Anthony, Knesich and International Fidelity interposed a cross claim against the District alleging the following: District and J. Anthony entered into the general contract for the performance of alterations at the project; in furtherance of its obligations under the general contract, J. Anthony entered into a subcontract with 212 Services for asbestos removal at the project; that 212 Services alleges that some of the work it performed was not contemplated by the subcontract and/or the general contract and thus, claims entitlement to additional compensation; and, to the extent 212 Services established that such work was extra and additional, then J. Anthony “is entitled to the issuance of a change order and additional compensation in the amount no less than 120,980.75”; and that J. Anthony “timely filed a Notice of Claim to the extent one was required” (exhibit Q to motion).
The District argues that dismissal of the cross claim for indemnification is warranted inasmuch as J. Anthony failed to comply with the contractual notice requirements set forth in the general contract as well as the statutory requirement that J. Anthony submit a timely verified notice of claim. For the reasons that follow, the court concludes that the cross claim for indemnification asserted against the District must be dismissed.
*351 a. Notice Requirements Pursuant to the General Contract
Pursuant to the general contract: J. Anthony was required to submit a claim[8] in writing, within 21 days from the date of occurrence; and the claim for additional compensation was required to be made before proceeding to perform the extra work (exhibit A to motion).[9] Here, the record is devoid of any written claim by J. Anthony that it sought an increase in the contract amount or that it sought a change order prior to the asbestos removal by 212 Services in the subject area above the locker room ceiling.
In opposition, J. Anthony argues that 212 Services first presented its claim for additional compensation to J. Anthony on June 27, 2013 and that “almost immediately” after that “during the biweekly construction progress meeting, J. Anthony presented the claim to the District and the District’s architect,” both of whom “rejected the claim taking the position that the *352 plans and specifications of the contract indicated removal of ‘all’ asbestos and determining that the asbestos around the pipes in the ceiling” was part of the contract.[10] Thus, according to J. Anthony, “the District had actual notice of the claim, fully participated in its consideration and J. Anthony’s contractual notice requirements are satisfied” (affirmation in opposition ¶¶ 17, 18).
Notwithstanding the fact that the District may have had “actual notice” of the claim as of June 27, 2013, when compensation for additional ACM removal work was rejected at a biweekly meeting, J. Anthony did not give “written notice” of the claim to the District until one year later, on June 18, 2014 (exhibit N to motion). Inasmuch as J. Anthony’s “written notice” of claim was untimely, having been made more than 21 days after the “occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later,” the court concludes that J. Anthony’s notice of claim failed to comport with section 4.7.3 of the general contract. Moreover, the record is devoid of any evidence that J. Anthony provided written notice of the claim before 212 Services performed the additional ACM removal, contrary to the requirement set forth in section 4.7.7 of the general contract.
b. Statutory Notice Pursuant to Education Law § 3813
Education Law § 3813 (l)* [11] requires a party to serve a notice of claim upon a school district within three months after the accrual of such claim as a condition precedent to the commencement of an action (see also School Aid Specialists, LLC v Board *353 of Educ. of Warwick Val. Cent. Sch. Dist., 130 AD3d 1006 [2d Dept 2015]; Zurich Am. Ins. Co. v Ramapo Cent. School Dist., 63 AD3d 729, 730 [2d Dept 2009]).
Claims arising out of a breach of contract accrue when “payment for the amount claimed was denied” (Education Law § 3813 [1]). A denial of payment is only deemed to occur “upon an explicit refusal to pay” or when a party should have viewed its claim as having been constructively rejected (Oriska Ins. Co. v Board of Educ., Richfield Springs Cent. School Dist., 68 AD3d 1190, 1191 [3d Dept 2009]; Capstone Enters. of Port Chester, Inc. v Board of Educ. Irvington Union Free Sch. Dist., 106 AD3d 856, 860-861 [2d Dept 2013]; Zurich Am. Ins. Co. v Ramapo Cent. School Dist., 63 AD3d at 731; Mainline Elec. Corp. v East Quogue Union Free School Dist., 46 AD3d 859, 861 [2d Dept 2007]).
Here, in support of that branch of the District’s motion which was for summary judgment dismissing the cross claim, the District demonstrated, prima facie, that J. Anthony failed to serve a notice of claim within three months of June 27, 2013, the date when the District explicitly refused payment for the additional ACM removal work performed at the project (see Matter of City of New York v Village of Lynbrook, 129 AD3d 838 [2d Dept 2015]).[12]
In opposition, 212 Services and J. Anthony failed to raise a triable issue of fact (see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Accordingly, the motion of the District seeking dismissal of the cross claim is granted.
Conclusion
Based on the foregoing, it is hereby ordered that the motion made by defendant Glen Cove City Central School District for an order pursuant to CPLR 3212 granting it summary judgment dismissing the cross claim, and complaint, insofar as asserted against it, is granted.

. Oladiran also stated in his affidavit that the drawings and specifications that were submitted with the subcontract did not include ACM wrapping the pipes above the locker rooms (Oladiran aff in opposition ¶ 8).

. The change order, which is not dated, indicated the following:
“Boys & Girls Locker Room (Additional Pipe Removal) (Not shown total)
*344 “Any ACM pipe & elbows removed beyond what is indicated on this drawing will be an extra cost beyond contract price (as per unit price submitted).”
The change order was signed by “Vito” on behalf of J. Anthony (exhibit C to Oladiran aff in opposition).

. In a progress meeting held on July 26, 2013, it was agreed that the District would pay as extra the following:
“GC claiming—-in Athletic Trainer’s Office additional pipe insulation above ceiling. Total cond of 113 If. [Architect] to review.
“114 LF included in locker room chase piping abatement. Allowance Authorization created and forwarded to [J. Anthony] for signature” (exhibit B to J. Anthony affirmation in opposition).

. The letter stated:
“We represent 212 Services, Inc. (the ‘Lienor’) with respect to the work performed by the Lienor for the Locker Room Alterations at the Glen Cove High School (the ‘Project’). Enclosed please find one (1) original Notice of Lien for Public Improvement on behalf of the lienor for filing with your office, along with two (2) copies of same. Please return one (1) stamped copy of the lien in the self-addressed, pre-paid envelope that had been provided for your convenience.”

. In opposition, the J. Anthony defendants maintain that
“[w]hile the District may not be a necessary party to the lien foreclosure action upon filing and serving of the lien discharge bond under Lien Law 21, there is nothing in the Lien Law mandating the dismissal of the foreclosure action upon the filing of the bond. The District is a proper and necessary party to the cross-claims asserted by J. Anthony” (J. Anthony affirmation in opposition ¶ 13).

. The Second Department in Norden rejected appellants’ contentions that the owner of the realty upon which the lien was recorded was a necessary party to the litigation because the “substitution of the bond for the mechanic’s lien discharged the lien, and there no longer existed any claim against the real property” (154 AD2d at 581).

. The court notes that the lien in Ruttura was not discharged until after the action was commenced. Here, although the discharge bond was filed on January 28, 2014, it was not served upon 212 Services until May 1, 2015. Pursuant to Lien Law § 21 (5) (a) when a contractor or subcontractor obtains a bond to discharge a lien on a public improvement project, the bond or undertaking “shall be filed with the state or the public corporation with which the notice of lien is filed and a copy shall be served upon the adverse party. The undertaking is effective when so served and filed.”

. A claim is defined in the general contract as:
“[A] demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term ‘Claim’ also includes other disputes and matters in question between the [District] and [J. Anthony] arising out of or relating to the Contract. Claims must be made by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim” (exhibit A at GC000122).

. Sections 4.7.3 and 4.7.7 provide:
“4.7.3 Time Limits on Claims. Claims by either party must be made within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be made by written notice. An additional Claim made after the initial Claim has been implemented by Change Order will not be considered unless submitted in a timely manner .... “4.7.7 Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Paragraph 10.3. If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner’s suspension or (7) other reasonable grounds, Claim shall be filed in accordance with the procedure established herein” (exhibit A at GC 000123).

. Knesich’s affidavit admits that J. Anthony was advised by the District and its architect that the claim for additional compensation was rejected at a meeting on June 28, 2013.

. Pursuant to Education Law § 3813:
“No action or special proceeding, for any cause whatever, except as hereinafter provided, relating to district property or property of schools ... or claim against the district or any such school, or involving the rights or interests of any district or any such school shall be prosecuted or maintained against any school district . . . unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment. . . .”

. The court declines to exercise its discretion, as requested by 212 Services, and extend J. Anthony’s time in which to file a late notice of claim (see General Municipal Law 50-e [5]). Moreover, the court rejects J. Anthony’s argument that because 212 Services filed its verified notice of mechanic’s lien, the District had notice of the claim and, thus, “serve [d] as notice within the meaning of Education Law § 3813” (J. Anthony affirmation in opposition ¶ 22).